IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC – 4 2017

UNITED STATES OF AMERICA

    v.

TYUS TERRELL,
  a/k/a "Taz"

    Defendant.

**UNDER SEAL**

Case No. 1:17-mj-572

The Hon. Theresa Carroll Buchanan

## AFFIDAVIT IN SUPPORT OF A<br>CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Michael A. Fernald, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since 2014. I am currently assigned to the Falls Church II Field Office within the Washington Field Division. Prior to my employment with ATF, I was a sworn police officer in the Commonwealth of Virginia from 2003 to 2014 and served in multiple capacities.

2.    During the course of my career, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen

register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

3. I submit this affidavit in support of a criminal complaint and arrest warrant for TYUS TERRELL (also known as "Taz") for possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1).

4. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

5. During the course of this investigation, law enforcement debriefed and used multiple cooperating sources. Regardless of the cooperating sources' gender, they will be referred to in the masculine gender. The cooperating sources have proven to be reliable and credible.

## I. Background on the Imperial Gangsta Blood Street Gang

### A. The United Blood Nation

6. Based on my research and information provided to me by cooperating sources, the United Blood Nation ("UBN") on the East Coast was established in 1993 on Rikers Island. UBN

was formed to combat the oppression of all black people by the Latin Kings and Nietas. It is an association of independent, structured groups ("Hoods") operating both in and outside of prison. There are four different "Nations" making up the United Blood Nation ("UBN"). The Nations of the UBN currently include: (1) New York Blood Brim Army (N.Y.B.B.A.); (2) Almighty Blood Stone Villain Nation (A.B.S.V.N.); (3) New York Bloods (N.Y.B.); and, (4) United Stone Gorilla Nation (U.S.G.N.). The UBN has a council composed of a Godfather (highest-ranking member) for every UBN Hood and all Hoods have an equal vote on matters pertaining to the UBN as a whole. A committee of Godfathers also exists to provide guidance to the UBN. The UBN is reportedly in the midst of a reorganization, where poor performing Hoods are being "clapped" or incorporated into a higher performing Hoods. There were eight (8) original Hoods in the UBN. The UBN now consists of twelve (12) Hoods, including: (1) Imperial Gangsta Bloods ("IGB"); (2) 9-Trey Gangsta Bloods; (3) G-Shine Bloods; (4) 3 Street Gangsta Bloods; (5) Valentine Bloods; (6) Ericket Hunter Bloods; (7) Double 9 Gangstas; (8) East Gangsta Bloods; (9) Murderous Mad Dogs; (10) 5 Star Gangsta Bloods; (11) Fayette Street Mobb; and (12) Gangland Gangsta Bloods.

7.     According to the National Drug Intelligence Center, most UBN sets derive illicit proceeds from the distribution of cocaine hydrochloride, cocaine base, heroin, and marijuana. UBN members are known by law enforcement to transport large quantities of drugs for distribution throughout the east coast. According to estimates, the UBN may exceed 7,000 members. Most members are African American males; however, many sets will recruit members of other races and ethnic backgrounds. Historically, female members and associates take active roles by holding drugs and firearms for members.

3

B.    The Imperial Gangsta Bloods

8.    The IGB (also known as "Str8 Gangsta") has its own history, oath, pledge and rules in addition to the UBN's. IGB was "birthed" on March 27, 2002, in Comstock, New York. The IGB Oath is, "I take this oath as my life to IGB, a chapter of UBN, to respect my brother and sister and to trust in them. To honor my Nation with loyalty and love as Royalty should, with my flag on my side and five in my stride. My neighborhood be Imperial." The IGB Pledge is, "I take this pledge to IGB, representing strength and understanding to bring for nobility and righteousness. To guide my hood effectively, with wisdom and honor, to stand strong in the face of all adversaries. I be that Imperial Gangsta Blood." The five royal rules of the IGB are (1) communication is an absolute must, (2) absolutely no cowardly act, (3) obey all orders given, (4) never deny royalty, and (5) never leave royalty in a battle.

9.    Every Hood in the UBN is allowed to have five (5) sub-districts. The IGB sub-districts include: (1) Blood Line Imperial; (2) B Gang Imperial; (3) Gangsta Blood Imperial; (4) Blood Money Imperial; and, (5) Mob Style Imperial.

10.    Like UBN, IGB members greet each other with a universal handshake and then display their particular Hood's hand sign. Members will say "Peace Blood" or "Peace Almighty" while performing the handshake.

11.    As stated above, the IGB are a Hood within the UBN and therefore its organization is similarly structured. The IGB organization from lowest to highest rank is: Foot Solider or Scrap, Green Light, 1-Star General or Minister of Communication, 2-Star General or Minister of Education, 3-Star General or Minister of Security, 4-Star General or Minister of Finance, 5-Star General or Minister of War. In addition, IGB has the ranks of Low 020, High 020, and Godfather. Members also use code words to conceal the rank held by individuals.

4

Within IGB, the Low 020 is referred to as the "Noble" and the High 020 is referred to as the "G Noble." Members that hold a rank above Low 020 will not participate in gang war as they are considered leadership. The rank structure within IGB carries authority only within their specific geographic area. IGB members who are well known to members in multiple geographic areas and known to travel frequently can be given "World Wide" status. World Wide status means that their rank and level of authority carries to whatever geographic area they are physically present in.

## II.  Background on the Investigation

12.    In March 2017, the ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating the IGB within the Northern Virginia area and elsewhere. IGB members are known by law enforcement to be involved in narcotics distribution, firearms trafficking, home invasions, robberies, assaults, and homicides in Virginia, the District of Columbia, and Maryland.

13.    In February 2017, a cooperating source ("CS-1") reported to the Prince William County Police Department that TARVELL VANDIVER ("VANDIVER") was a narcotics distributor. CS-1 is an IGB member. CS-1 will be referred to in the masculine gender, regardless of CS-1's true gender. CS-1 has been convicted of two felonies, including robbery and a probation violation. CS-1 was arrested in December of 2016, in Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances. CS-1 originally cooperated because he hoped to receive a lesser sentence. Based on CS-1's cooperation, his charges were dismissed. CS-1 continues to cooperate because he is being compensated. CS-1 also hopes to be relocated.

14.     CS-1 informed law enforcement that members of the IGB located in Northern Virginia and their associates were involved in the distribution of controlled substances, firearms, and have committed acts of violence, including armed home invasions, robberies, and murder. CS-1 has purchased cocaine from VANDIVER since 2014. VANDIVER was identified by CS-1 as an IGB member of high rank. VANDIVER taught CS-1 how to manufacture cocaine base. CS-1 also informed law enforcement that VANDIVER's stepfather, RASHOURN NILES ("NILES"), is VANDIVER's primary source of supply for controlled substances.

### III.     Northern Virginia IGB Members in this Investigation

15.     According to CS-1, the defendants charged in this or one of the related complaints hold the ranks or positions listed below. CS-1 informed law enforcement that the IGB in this area use slightly different rank names than the ranks described in the previous section. Their roles and responsibilities remain similar.

16.     VANDIVER is one of the lead targets of this investigation and law enforcement identified him as holding the IGB rank of HIGH 020. VANDIVER is reported to be the superior in this region. VANDIVER coordinates with leadership in multiple states, oversees the set, calls for regional and local meetings, and acts as the disciplinary officer for the set.

17.     CS-1 holds the rank of 4-Star General and was appointed the treasurer for the region.

18.     BRANDON EDLER (also known as "Livewire") is a scrap or foot soldier. CS-1 reported EDLER has no authority in the gang and cannot invite new members to join. EDLER cannot serve as a mentor or "Big Homie."

## IV.    Law Enforcement Contact with northern Virginia IGB Members and Associates

19.    In September 2008, the ATF arrested NILES for conspiracy to distribute cocaine base (also known as "crack" cocaine). NILES pleaded guilty in the Eastern District of Virginia to gun and drug charges and was sentenced. NILES was interviewed and admitted to being involved in the distribution of controlled substances since early 2005. NILES admitted he began selling marijuana in 2005 and cocaine hydrochloride and cocaine base in or around 2006. From fall 2006 to fall 2008, NILES estimated he sold on average 4.5 ounces of cocaine base per week. NILES also admitted to providing VANDIVER with 1/8 ounce quantities of cocaine base at the time.

20.    In April 2009, a victim contacted PWCPD and stated he had ordered a quantity of marijuana from a co-conspirator ("Co-Conspirator 1"). When the victim entered Co-Conspirator 1's vehicle, he was "shocked" with a stun gun by Co-Conspirator 1's friend "VEL." The victim reported he was punched, kicked, and "shocked" multiple times by Co-Conspirator 1 and "VEL." The victim reported he knew "VEL" to be regularly armed with a firearm. "VEL" is one of VANDIVER's known aliases. VANDIVER and Co-Conspirator 1 currently reside together at 1288 Bayside Avenue #11, Woodbridge, Virginia and continue to distribute controlled substances from the residence.

21.    In November 2014, the Rappahannock Area Gang Information network received intelligence that monthly IGB gang meetings had been taking place at VANDIVER's home in Dumfries, Virginia. VANDIVER was reportedly living with another IGB member and traveling often to Norfolk, Virginia, and New York. The source stated that VANDIVER was a 5-Star General and that PLATINUM (who is CS-1) was a 1-Star General.

7

22.     In January 2015, the FBI obtained information about the IGB and UBN being re-organized into five "branches" in Virginia, each with its own leadership. The source of information reported VANDIVER had been promoted to the Low 020 position in Northern Virginia. The source also identified MONTREUS PETERSON ("PETERSON") and PLATINUM (CS-1) as members of the IGB.

23.     In April 2015, the PWCPD responded to a shooting incident in Woodbridge, Virginia, in which three individuals were struck with bullets. During the investigation, PWCPD learned there was a birthday party on Filarette Street. A group of individuals arrived at the party and wanted to enter. When the individuals were denied entry, the group became confrontational and claimed that as Bloods members they were owed more respect. Shortly after the confrontation, one of the Bloods members entered a vehicle and fired multiple gunshots in the direction of the residence and struck three individuals as the vehicle was driving away. A source came forward to PWCPD and identified a Bloods member ("Unnamed IGB Member 1") and another individual as being involved in the shooting. Forensic evidence led investigators to believe there was one shooter because all casings recovered from the scene were fired from the same .40 caliber firearm.

24.     Days later in April 2015, the PWCPD stopped a vehicle in Dumfries, Virginia, and encountered ISHMIL RYSHEEM HARDWICK ("HARDWICK") and Unnamed IGB Member 1. PWCPD officers detected an odor of marijuana emanating from the vehicle, which resulted in the occupants of the vehicle being detained. Law enforcement then conducted a probable cause search of the vehicle. Unnamed IGB Member 1 was the front passenger and HARDWICK was a rear passenger of the vehicle. Inside the unlocked glove box, PWCPD personnel located and seized a Raven .25 caliber pistol, a Rossi .38 caliber revolver, a quantity of

8

suspected cocaine, and a quantity of marijuana. A round of .38 caliber ammunition was located under the rear passenger seat where HARDWICK was seated.

25.     In June 2015, the Washington, D.C. Metropolitan Police Department ("MPD") responded to a shooting in the area of Galveston Place, S.W. Upon their arrival, a Bloods member ("Unnamed IGB Member 2") was found deceased from multiple gunshot wounds. Unnamed IGB Member 2 was reportedly a drug distributor.

26.     In July 2015, the PWCPD responded to a residence on Port Hope Point in Triangle, Virginia, for a shooting into an occupied dwelling. A subject had knocked on the door of an individual's home ("Individual 1") asking for a family member, who was one of the MPD murder suspects for the murder mentioned in the previous paragraph. Individual 1 did not answer the door and the next day unknown subjects fired at the residence.

27.     Also in July 2015, the PWCPD stopped a vehicle for an expired registration and upon approaching the vehicle, PWCPD personnel detected an odor of marijuana emanating from the vehicle. Unnamed IGB Member 1 was the driver of the vehicle and did not have a valid operator's license. Upon being removed from the vehicle and detained, another occupant fled the vehicle. When law enforcement apprehended the passenger, law enforcement seized a stolen Smith &Wesson 9mm pistol from the passenger's waistband.

28.     In early August 2015, SADE ANGLIN ("ANGLIN") showed up at Individual 1's employer and got into a physical altercation with Individual 1. Several days later, both women got into another altercation at a bar in Woodbridge. More specifically, Individual 1 and another individual ("Individual 2") were at a bar, when Individual 2 received a text that she and her friend needed to leave because something was going to happen them. When Individual 2 and her friend approached their vehicle, they realized one of their tires had been slashed. Individual 1

9

reported to law enforcement that she observed VANDIVER, ANGLIN, and other individuals walking towards them. Individual 1 stated that she then grabbed a box cutter for protection when she was punched by a male. Individual 1 reported she fell unconscious and awoke to ANGLIN punching and kicking her. Individual 1 reported to PWCPD that she picked up the box cutter and started swinging it to get her attackers away. ANGLIN's brother then grabbed Individual 1 and caused her to drop the box cutter again. ANGLIN then began punching and kicking her again. Individual 1 also reported VANDIVER punched her in the face.

29.     In November 2015, the PWCPD again encountered Unnamed IGB Member 1 in Woodbridge, Virginia. The PWCPD had received a narcotics tip in the area of Wrangler Lane and upon their arrival in the area detected an odor of marijuana. PWCPD personnel made contact with two individuals, including Unnamed IGB Member 1, who was observed leaning into a parked vehicle. Unnamed IGB Member 1 was observed making a furtive gesture from his left inside shoulder area of his jacket to the interior of the vehicle. PWCPD personnel detained Unnamed IGB Member 1 and conducted a search of his person and the vehicle. Law enforcement identified an empty firearm holster under Unnamed IGB Member 1's shoulder. Inside the vehicle, PWCPD personnel located and seized a Springfield Armory XD .40 caliber pistol.

30.     In November 2015, the PWCPD were dispatched to a report of a brandishing of a firearm. The suspect was identified as a member of the Bloods; however, the Victim ("Individual 3") did not want to file charges out of fear of retaliation. Individual 3 informed law enforcement about a shooting at a party on Filarete Street in which several individuals "got shot up." Individual 3 identified Unnamed IGB Member 1 as the shooter and further reported hearing Unnamed IGB Member 1 brag about being responsible for the 89th and 90th murders in

Washington, D.C. Individual 3 grew up with Unnamed IGB Member 1. Individual 3 stated that Unnamed IGB Member 1 had also reported he was present when Unnamed IGB Member 2 was killed in June 2015. Individual 3 further reported Unnamed IGB Member 1 was trying to make a name for himself within the Bloods.

31.     In April 2016, the PWCPD received information on IGB working with another area gang. IGB was reported to be working with SQAD, a reported music production group. Members were involved in narcotics and firearm distribution, robbery, home invasions, and theft. VANDIVER allegedly provided the firearms observed in music videos and NASIRU CAREW ("CAREW") allegedly supplied the money for the production. CAREW is known to be the head of I Got Me ("IGM"), which is a drug distribution network out of San Diego, California.

32.     In October 2016, the PWCPD received information that VANDIVER was a 5-Star General with the IGB. The source of information stated VANDIVER has females rent apartments under their names. The source stated VANDIVER would carry narcotics attached to his scrotum to avoid detection by law enforcement. The source also provided information on individuals reported to be VANDIVER's "inner circle." CAREW was part of this inner circle and was reported to be a narcotics source with ties to California.

33.     In December 2016, the PWCPD conducted a knock and talk at a residence on Greendale Drive in regards to HARDWICK. The PWCPD received information that HARDWICK was distributing controlled substances from the residence and had stolen guns from an elderly resident. When they made contact with the owner of the home, he told PWCPD that HARDWICK was no longer allowed at the residence because he had stolen firearms from his residence. The stolen firearms included a Smith & Wesson .40 caliber pistol and a Colt 1911

.45 caliber pistol. HARDWICK told the homeowner he was a "lick" (common street term for a robbery).

## V.    **Probable Cause**

34.    During the course of this investigation, law enforcement coordinated numerous controlled purchases of controlled substances from, or through, VANDIVER. In each instance where a cooperating source conducted a law enforcement directed purchase of controlled substances, the cooperating source was searched for contraband before and after the transaction. During each transaction, audio and/or video recorders were used in conjunction with law enforcement surveillance. Further, all of the controlled substances purchased were submitted for laboratory testing. Below, I do not detail each and every purchase of controlled substances; rather, I focus only on the significant purchases for the purposes of this affidavit. However, the below table does detail each law enforcement directed purchase in this investigation, including controlled purchases for all controlled substances; though, in this affidavit I will only seek a charge for conspiracy to distribute cocaine or cocaine base (depending on the defendant). Both substances are Schedule II controlled substances.

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 1 | 03/02/2017 | Cocaine | 27.71 grams | Cocaine HCL |
| 2 | 03/11/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 3 | 03/23/2017 | Cocaine | 55.75 grams | Cocaine HCL |
| 4 | 03/28/2017 | Heroin | 3.55 grams | Fentanyl |
| 5 | 03/30/2017 | Cocaine | 123.12 grams | Cocaine HCL |
| 6 | 03/30/2017 | Heroin | 3.44 grams | Fentanyl/Heroin |
| 7 | 04/06/2017 | Cocaine Base | 108.82 grams | Cocaine Base |
| 8 | 04/06/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 9 | 04/25/2017 | Heroin | 75.17 grams | Fentanyl/Heroin |
| 10 | 05/02/2017 | Heroin | 86.40 grams | Heroin |
| 11 | 05/04/2017 | Cocaine Base | 185.10 grams | Cocaine Base |
| 12 | 05/09/2017 | Cocaine | 27.98 grams | Cocaine HCL |
| 13 | 05/10/2017 | Cocaine Base | 14.58 grams | Cocaine Base |
| 14 | 05/17/2017 | Cocaine Base | 25.75 grams | Cocaine Base |
| 15 | 05/18/2017 | Marijuana | 41.08 grams | Marijuana |
| 16 | 05/24/2017 | Cocaine Base | 41.08 grams | Cocaine Base |
| 17 | 05/25/2017 | Heroin | 54.31 grams | Heroin |
| 18 | 06/01/2017 | Heroin | 49.49 grams | Heroin |
| 19 | 06/02/2017 | Cocaine Base | 41.97 grams | Cocaine Base |
| 20 | 06/08/2017 | Cocaine Base | 32.73 grams | Cocaine Base |
| 21 | 06/15/2017 | Heroin | 46.61 grams | Heroin |

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 22 | 06/16/2017 | Cocaine Base | 55.35 grams | Cocaine Base |
| 23 | 06/22/2017 | Cocaine Base | 66 grams est. | Lab Pending |
| 24 | 07/06/2017 | Cocaine Base | 29 grams est. | Lab Pending |
| 25 | 07/26/2017 | Cocaine Base | 27.40 grams | Cocaine Base |
| 26 | 07/27/2017 | Marijuana | 1,266.9 grams | Marijuana |
| 27 | 08/11/2017 | Cocaine Base | 54.13 grams | Cocaine Base |
| 28 | 08/17/2017 | Cocaine Base | 52.81 grams | Cocaine Base |
| 29 | 08/31/2017 | Cocaine Base | 369.89 grams | Cocaine Base |
| 30 | 10/30/2017 | Cocaine HCL | 505 grams est. | Lab Pending |
| 31 | 11/09/2017 | Heroin | 43 grams est. | Lab Pending |

A. Controlled Purchase of Cocaine from VANDIVER on March 2, 2017

35. On March 2, 2017, CS-1, at law enforcement direction, contacted VANDIVER and ordered one (1) ounce of cocaine. VANDIVER traveled with CS-1 to a residence located on East Longview Drive in Woodbridge, Virginia, within the Eastern District of Virginia. Inside the apartment, CS-1 observed a black pistol in plain view sitting on a table in the living room. VANDIVER retrieved approximately three (3) ounces of cocaine from a suitcase in the living room, separated one (1) ounce of cocaine from the larger quantity, and provided it to CS-1. CS-1 in return paid $1,300 in documented funds to VANDIVER. After the transaction, law enforcement displayed a photograph of VANDIVER to CS-1 and CS-1 positively identified him. The cocaine was submitted to the Drug Enforcement Administration ("DEA") Mid-Atlantic Laboratory and tested positive for 27.71 grams of cocaine hydrochloride.

14

B.  IGB Gang Meeting and Controlled Purchase of a Firearm and Cocaine on March 11, 2017

36.  On March 8, 2017, CS-1 reported to law enforcement that there would be an IGB gang meeting on March 11, 2017. CS-1 reported VANDIVER would be at the meeting and that he would be able to purchase cocaine from him. On March 11, 2017, the meeting took place at the Hilton Garden Inn, which is located on 2500 Neabsco Common Place, Woodbridge, Virginia.

37.  Prior to the gang meeting, CS-1 granted law enforcement access to the hotel room to place audio/video recorders in the room. Based on law enforcement's review of the recording, CS-1's description of the events and conversations at the gang meeting was accurate.

38.  Prior to other IGB members arriving to the hotel room, CS-1 and VANDIVER discussed firearms. VANDIVER reported he knew whom to call in order to obtain a firearm. VANDIVER then called HARDWICK (also known as "Ish") via FaceTime and negotiated a price for a firearm that HARDWICK was willing to sell. HARDWICK reported to CS-1 and VANDIVER that he had paid $400 for the firearm and had purchased a magazine for the firearm. CS-1 and HARDWICK agreed to a price of $500 for the firearm.

39.  Based on a review of HARDWICK's criminal history, law enforcement determined that HARDWICK has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Prince William County Circuit Court of possession with intent to distribute a Schedule I or II controlled substance, in violation of Code of Virginia § 18.2-248. HARDWICK is therefore prohibited from possessing firearms under federal law.

40.  The meeting started later in the evening and was audio and video recorded by law enforcement. Several IGB members attended the meeting, including, but not limited to,

15

VANDIVER, PETERSON (also known as "Impact"), HARDWICK, BRANDON EDLER (also known as "Livewire"), Unnamed IGB Member 3 and others.

41.     During this meeting, gang members discussed trafficking firearms to New York. Further, the gang members discussed ripping up the flooring of vehicles to conceal firearms. Several gang members arrived prior to HARDWICK, who law enforcement observed arrive at approximately 6:05 p.m. HARDWICK entered the hotel room and removed a black pistol from his waistband. HARDWICK handed the firearm to CS-1, while discussing other firearms. CS-1 paid HARDWICK the agreed upon $500.

42.     After CS-1 took possession of the firearm, several gang members also possessed the firearm, including PETERSON. Law enforcement reviewed the video of the meeting and confirmed that PETERSON held the firearm. Based on a review of PETERSON's criminal history, it was determined that PETERSON has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Prince William County Circuit Court of possession with intent to distribute a Schedule I or II controlled substance, in violation of Code of Virginia § 18.2-248.

43.     Later that evening, CS-1 and VANDIVER left the hotel in CS-1's vehicle. Law enforcement followed CS-1 from the hotel to a Wal-Mart parking lot located on Worth Avenue. CS-1 stated that VANDIVER called his "molly" (also known as methylenedioxymethamphetamine or MDMA) source of supply and that VANDIVER was told to meet at that location. While CS-1 and VANDIVER waited in the vehicle, an individual approached CS-1's vehicle and leaned through the open window to speak with VANDIVER. CS-1 later positively identified RASHOURN NILES from a DMV photograph, as being the individual who leaned through CS-1's window to speak with VANDIVER. NILES made a

16

statement to VANDIVER to the effect of "you know what I drive," followed by a description of where his vehicle was parked within the parking lot. CS-1 drove VANDIVER to the specified location where he reported VANDIVER entered a black BMW SUV ("Subject Vehicle 1"), retrieved an unknown quantity of molly, and left cash payment for the molly within the vehicle.

44. After departing the Wal-Mart parking lot, CS-1 and VANDIVER drove to a residence located on Bayside Avenue in Woodbridge and entered a co-conspirator's ("Co-Conspirator 2") apartment. Inside the apartment, CS-1 purchased one (1) ounce of cocaine for $1,300 in documented funds from VANDIVER. The cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.92 grams of cocaine hydrochloride.

45. CS-1 reported that HARDWICK also arrived at the apartment to pick-up a quantity of cocaine. VANDIVER and HARDWICK had worked out a deal in which HARDWICK brought $140 in alcohol and VANDIVER paid him back double that amount in cocaine. CS-1 also reported VANDIVER provided Co-Conspirator 2 with cocaine. CS-1 stated that Co-Conspirator 2 sold cocaine and cocaine base from his apartment and allowed VANDIVER to sell and store cocaine in the apartment.

46. CS-1 learned the molly purchased by VANDIVER from NILES and a quantity of cocaine were for EDLER. An additional quantity of molly was for PETERSON as well.

47. CS-1 later turned over the firearm he purchased from HARDWICK to law enforcement. The firearm is a Walther model PPX 9mm pistol. Based upon my training and experience, I know the Walther pistol to be a firearm as that term is defined under Title 18, United States Code, Section 921(a)(3).

C.     Controlled Purchase of Cocaine from VANDIVER on March 23, 2017

48.     On March 23, 2017, CS-1, at law enforcement direction, contacted VANDIVER to order two (2) ounces of cocaine. VANDIVER instructed CS-1 to meet him at a restaurant in Woodbridge. Law enforcement observed VANDIVER meet with NILES, who was driving Subject Vehicle 1, at a gas station adjacent to the restaurant. CS-1 then met with VANDIVER and they both departed the area in VANDIVER's vehicle. VANDIVER reported Unnamed IGB Member 3 had just purchased an ounce of cocaine from VANDIVER and PETERSON was going to buy an ounce in the future. VANDIVER also reported to CS-1 that the firearm Unnamed IGB Member 1 was caught with belonged to VANDIVER. VANDIVER went on to say, "I'm not talking about the body, I'm talking about the strap (firearm)." VANDIVER stated it was, "One of my clean straps that I bought from [Individual 4]. [Individual 4] bought it from his white boy out the gun store, the clean joints." Individual 4 had been recently arrested during an NYPD investigation into firearms trafficking to NY.

49.     VANDIVER drove with CS-1 to an address located on Bellona Road in Woodbridge. Inside the apartment, VANDIVER reported to CS-1 that he had just met with his stepfather (NILES) before meeting CS-1. SADE ANGLIN (also known as "Pooh") is the tenant in this apartment. CS-1 reported ANGLIN has a relationship with VANDIVER. CS-1 further reported ANGLIN kept a "draco" pistol in the residence. When CS-1 and VANDIVER entered ANGLIN's apartment, VANDIVER removed a bag containing cocaine from his person. VANDIVER and CS-1 then went to a bedroom where a scale was sitting out in the open on top of a piece of furniture. VANDIVER had a little over two (2) ounces of cocaine, which they weighed out. CS-1 agreed to purchase the cocaine for $2,600 in documented funds. The cocaine

18

was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 55.75 grams of cocaine hydrochloride.

50.     VANDIVER then called a subject later identified as HARDWICK and informed him that he's "got an eighth of that bitch (cocaine) left, you straight?" VANDIVER further stated, "Yeah, it's 3.8 too."

51.     After leaving ANGLIN's apartment, VANDIVER and CS-1 drove to Ashdale Plaza in Woodbridge. HARDWICK was observed by law enforcement pulling into the same parking lot. CS-1 reported HARDWICK met with VANDIVER and told him he was trying to obtain an ounce of cocaine. HARDWICK then reported he had a new source of heroin in the city (D.C.). HARDWICK stated that he sold the heroin in Virginia and made almost $1,000. HARDWICK further stated that he currently had eight (8) grams of heroin and would provide VANDIVER a "trey five" (3.5 grams or 1/8 ounce commonly referred to as an 8-ball) for $300. VANDIVER then sold his remaining 3.8 grams of cocaine to HARDWICK. After the transaction, law enforcement followed HARDWICK to a residential area near Ferrara Terrace and Filarete Street in Woodbridge, Virginia.

D.     Controlled Purchase of Heroin from HARDWICK on March 28, 2017

52.     On March 28, 2017, CS-1, at law enforcement direction, contacted HARDWICK and ordered a quantity of heroin. When CS-1 arrived at the agreed meeting location, HARDWICK was not present and did not answer his phone. CS-1 then contacted VANDIVER, who provided CS-1 with HARDWICK's address on Ferrara Terrace. CS-1 attempted to make contact with HARDWICK at the residence, however, HARDWICK did not answer. CS-1 then met up with VANDIVER and entered VANDIVER's vehicle. HARDWICK eventually made contact with CS-1 and VANDIVER and told them both to come by his residence later.

19

53. While driving, VANDIVER made a FaceTime call to NILES and asked NILES if he had more than the four and a half (cocaine). VANDIVER and CS-1 discussed purchasing a quantity of cocaine together, which would cost CS-1 $5,400 for his share. VANDIVER reported he would pick up the cocaine. VANDIVER then placed a call to ANGLIN and informed her that he was stopping by. VANDIVER then drove to ANGLIN's residence and he entered along with CS-1. VANDIVER, ANGLIN, and CS-1 entered a back bedroom where VANDIVER retrieved an unspecified amount of cocaine that was stored in a shoebox in ANGLIN's closet. CS-1 reported it was the same bedroom that ANGLIN kept her "draco" pistol in under the bed. CS-1 was also able to photograph what appeared to be multiple ounces of cocaine in a box stored within a shoebox containing women's UGG boots.

54. Law enforcement confirmed ANGLIN did in fact purchase a Century Arms Incorporated model C39 7.62x39 caliber pistol in July 2016. This pistol is commonly referred to as a "draco" pistol. CS-1's description of the pistol was corroborated by her firearm transaction. As explained above, CS-1 stated ANGLIN kept the pistol under her bed. Further, this was the same bedroom cocaine was being stored in and a digital scale was present in.

55. It was evident to CS-1 that ANGLIN knew what was being stored in her apartment and where it was located. ANGLIN also had children present in the apartment with her.

56. VANDIVER and CS-1 departed ANGLIN's residence and then travelled to HARDWICK's residence. HARDWICK then exited his residence and entered VANDIVER's vehicle. HARDWICK provided CS-1 with approximately four (4) grams of heroin in return for $300 in documented funds. The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 3.55 grams of fentanyl, a Schedule II controlled substance.

57.     After the transaction, law enforcement conducted an employment check on ANGLIN. ANGLIN reported less than $600 income in the first quarter of 2017, despite living in an apartment that costs a great deal more monthly. According to ANGLIN's phone records, she is in contact not only with VANDIVER, but several other co-conspirators in this investigation.

### E.     Controlled Purchase of Cocaine from VANDIVER and Heroin from HARDWICK on March 30, 2017

58.     On March 30, 2017, CS-1, at law enforcement direction, contacted HARDWICK and ordered a quantity of heroin and a firearm. HARDWICK advised he only had heroin at that time and CS-1 agreed to purchase a quantity of heroin. At the same time, CS-1 ordered a "four deuce" (4.5 ounces) of cocaine from VANDIVER.

59.     CS-1 met with VANDIVER at the Potomac Mills Mall and entered his (VANDIVER's) vehicle. A FaceTime call was placed to HARDWICK in which they discussed "dawgs" (guns) and "food" (heroin). HARDWICK reported he did not have any guns and offered to introduce CS-1 to his source of supply in Washington, D.C. for the heroin. HARDWICK described the source as an older male in his 40's who was "on the run for life, he can't even come to VA." This source of heroin is believed to be the same source of supply for JAVELL JOHNSON (also known as "JACK"). HARDWICK reported he had just met his "Minnesota Ave" source and picked up seven (7) grams of heroin. This is consistent with JOHNSON who would meet his source of supply for heroin on Minnesota Avenue. CS-1 informed HARDWICK that he would purchase the heroin and HARDWICK ended the call by telling him, "You know where I'm at" (his residence).

60. VANDIVER informed CS-1 that another IGB member had been robbed by unknown males in the Richmond or Norfolk area. VANDIVER expressed that he was upset that gang members had not yet retaliated.

61. VANDIVER received a phone call in which an unidentified caller reported he wanted a half ounce of cocaine. VANDIVER agreed to meet the unidentified caller later that day and agreed to sell the cocaine for $700. The unidentified individual called VANDIVER again and asked if he was ready. VANDIVER reported he was pulling up to "the spot" now and asked the caller to meet at the Popeye's. VANDIVER and CS-1 then drove to "the spot" which turned out to be ANGLIN's residence on Bellona Road. VANDIVER called ANGLIN before they arrived.

62. While inside ANGLIN's residence, CS-1 observed ANGLIN and two to three young children in the apartment. ANGLIN can be heard on a recording talking with VANDIVER and CS-1. CS-1 reported VANDIVER retrieved an Ugg shoebox from the top shelf of ANGLIN's bedroom closet and that the box contained an unknown quantity of cocaine. CS-1 reported VANDIVER weighed out and then packaged 4.5 ounces of cocaine for him. While preparing the cocaine VANDIVER placed a phone call to NILES, which is supported both by CS-1's statements and telephone toll records. During this call, VANDIVER and NILES clarify the weight of cocaine that VANDIVER purchased from him earlier. VANDIVER provided the cocaine to CS-1, who in return paid $5,400 in documented funds. The cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 123.12 grams of cocaine hydrochloride.

63. Later in the evening, CS-1 and VANDIVER communicated with HARDWICK via FaceTime. HARDWICK reported he would be home soon. VANDIVER drove CS-1 to

22

HARDWICK's residence. CS-1 reported HARDWICK walked to VANDIVER's vehicle from his residence and entered the vehicle. HARDWICK reported he was unable to obtain a firearm for CS-1. HARDWICK then provided CS-1 with approximately four (4) grams of heroin in return for $300 in documented funds. The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 3.44 grams of a mixture containing fentanyl and heroin.

F.    Controlled Purchase of Cocaine Base and Cocaine from VANDIVER on April 6, 2017

64.    On April 6, 2017, CS-1, at law enforcement direction, contacted VANDIVER via FaceTime to order two (2) ounces of cocaine base (also known as "crack" cocaine) and one (1) ounce of cocaine. VANDIVER told CS-1 to "let him call my peoples and see if we can do it at the house real quick" (manufacture cocaine base). VANDIVER's toll records revealed he called ANGLIN's known telephone number. A short time later, VANDIVER called CS-1 and directed him to ANGLIN's residence.

65.    When CS-1 entered ANGLIN's apartment, VANDIVER, ANGLIN, and children were present. VANDIVER began to manufacture cocaine base, while discussing his process with CS-1. ANGLIN was also present during the cooking of the cocaine base and conversation. At one point, VANDIVER received a phone call and ANGLIN took the call on his phone. She could be heard relaying a question to VANDIVER from whomever she was speaking. Around the same time, one of the children could be overheard asking ANGLIN a question and ANGLIN responded to the child. According to CS-1, VANDIVER was using various kitchen utensils, a bowl, and the microwave to manufacture the cocaine base. VANDIVER told CS-1 that when he

manufactures cocaine base, he lets it sit out overnight even though the cocaine gets hard after approximately one hour.

66.     According to call records, VANDIVER then received a phone call from MICHAEL LEDERER's known telephone number. LEDERER's phone number was identified through toll records and a law enforcement database. VANDIVER agreed to meet LEDERER. A short time later, VANDIVER left out the manufactured cocaine base to dry at ANGLIN's apartment. VANDIVER and CS-1 exited ANGLIN's apartment where she remained and entered VANDIVER's vehicle. Law enforcement followed VANDIVER and CS-1 to a McDonalds in Ashdale Plaza.

67.     While waiting for LEDERER to arrive, VANDIVER reported that Unnamed IGB Member 3 was getting straight onions (ounces of cocaine) every week.

68.     VANDIVER then received a FaceTime call from CAREW. CAREW asked VANDIVER what he was doing and he replied, "Just got out of the kitchen whipping" (manufacturing cocaine base).

69.     Law enforcement next observed VANDIVER exit his vehicle, while speaking on the phone to CAREW and meeting with LEDERER. VANDIVER returned to his vehicle and informed CS-1 that he had just made a sale. Law enforcement then observed LEDERER conduct a hand-to-hand transaction with a female in the same parking lot.

70.     VANDIVER and CS-1 then drove back to ANGLIN's residence. Inside the residence, VANDIVER made a FaceTime call to NILES and informed him that he had let the cocaine base sit out for about an hour, but that the cocaine was still soft. NILES told VANDIVER to put the cocaine back in the microwave. VANDIVER can be heard on the recording calling out to ANGLIN and asking her if the hair-dryer worked because it was not

24

turning on. ANGLIN instructed him on how to activate it and CS-1 reported VANDIVER used the hair-dryer to dry the cocaine base in conjunction with the microwave.

71.     VANDIVER put a quantity of cocaine on a scale and reported it weighed 1.1 (ounces). VANDIVER then finished preparing the cocaine base, packaged it, and handed it to CS-1. CS-1 then provided VANDIVER with $4,900 in documented funds. The cocaine hydrochloride was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.92 grams of cocaine hydrochloride. The cocaine base was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 108.82 grams of cocaine base.

G.     CS-1 Communication with VANDIVER about NILES being his Source of Supply

72.     CS-1 recorded two FaceTime calls with VANDIVER. In the calls, VANDIVER reported that NILES was recently arrested and would have to deal with Prince William County and federal probation. VANDIVER reported that if NILES is arrested that his (VANDIVER's) narcotics distribution would be shut down. VANDIVER then stated that he wanted to meet NILES' supplier, so he could continue to distribute controlled substance. VANDIVER and CS-1 discussed pooling their money together in order to purchase a half of a kilogram to one kilogram of cocaine. VANDIVER further stated that if he and CS-1 can put in $20,000, NILES might put in the remaining $16,000. VANDIVER discussed obtaining a new phone number because he was worried about federal law enforcement and his connection with gangs.

H.     Arrest of HARDWICK on April 11, 2017 and the Seizure of Controlled Substances, Firearms, and Ammunition

73.     ATF agents learned that HARDWICK was wanted in Prince William County. ATF agents shared HARDWICK's fugitive status with the United States Marshals Service

("USMS") Fugitive Task Force. The USMS took HARDWICK's case for service of the arrest warrant.

74.     On April 11, 2017, the USMS interviewed a subject leaving the residence on Filarete Street, who confirmed that HARDWICK was in the upstairs master bedroom. Upon entry into the home, law enforcement smelled an odor of marijuana. During the protective sweep, it was apparent to law enforcement that HARDWICK was attempting to flush marijuana down the toilet. A shoebox in the bathtub still contained marijuana, suspected heroin or cocaine, and packaging materials. Based on the contraband and odor of marijuana identified in plain view, the PWCPD obtained a state search warrant for the residence. HARDWICK was ultimately arrested on the second floor in a bedroom other than the master bedroom where he stayed.

75.     During the subsequent court-authorized search of the residence, law enforcement seized a Glock .40 caliber pistol with an extended magazine loaded with 16 rounds of .40 caliber ammunition from the water tank of the second floor bathroom toilet. Based upon my training and experience, I know the Glock .40 caliber pistol to be a firearm as that term is defined under Title 18, United States Code, Section 921(a)(3). In the bathtub, law enforcement seized a shoebox containing suspected heroin or cocaine. The suspected heroin or cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for two (2) grams of fentanyl. Law enforcement also seized a Glock magazine containing four (4) rounds of .40 caliber ammunition, three additional magazines, inositol, a digital scale, packaging materials, and records and documents for HARDWICK from the master bedroom. Based on my training and experience in investigating controlled substances, I know inositol to be a common cutting agent that drug dealers use to dilute controlled substances.

26

76.     HARDWICK was the only occupant of the residence located on the second floor. Other residents in the home stated that HARDWICK resided in the master bedroom. Further, the occupant of the bedroom in which HARDWICK was arrested stated that HARDWICK did not live in that bedroom.

77.     After HARDWICK was advised of his *Miranda* rights and waived those rights, HARDWICK admitted to being a "small time" dealer of heroin. HARDWICK also admitted that heroin was located in his residence. HARDWICK initially reported that he had no knowledge of firearms in the residence. However, when law enforcement challenged HARDWICK, he responded, "Everything in that house is mine, it's easier to say that, is that good enough?" HARDWICK then said, "I'm going to be honest, I want to help myself, everything in the house is mine."

78.     Regarding the Glock pistol, HARDWICK admitted, "I put it in the toilet." When asked what kind of magazine was in the firearm, HARDWICK replied, "It was an extended magazine." HARDWICK admitted he purchased the firearm from someone for $500. HARDWICK initially reported the firearm was for home and family protection, but later admitted, "Somebody could have robbed me and I would have shot their ass." HARDWICK admitted he flushed heroin and marijuana and that he had planned to flush the rest of the drugs in the shoebox. He reported none of the drugs was cocaine, which is consistent with subsequent lab analysis.

I.     Controlled Purchase of Heroin from JERRY MCCALLISTER on April 25, 2017

79.     In the days leading up to April 25, 2017, CS-1, at law enforcement direction, contacted VANDIVER and arranged to purchase two (2) ounces of cocaine base and one (1) ounce of powder cocaine. Prior to the transaction, VANDIVER reported to CS-1 that he was

"dry" (out of cocaine). CS-1 also discussed purchasing heroin through VANDIVER and NILES. CS-1 met VANDIVER at a location in the Eastern District of Virginia.

80.　　After meeting with VANDIVER, CS-1 attempted to purchase heroin through another co-conspirator. However, this co-conspirator was out of the area. CS-1 asked VANDIVER to call NILES to see if he (NILES) could facilitate a heroin transaction. In CS-1's presence, VANDIVER called NILES via FaceTime and asked him if he could assist in obtaining heroin for them. They agreed to meet at a location in Prince William County. VANDIVER and CS-1 rented a hotel room and then waited in VANDIVER's vehicle in the parking lot. A short time later, NILES was observed pulling into the same parking lot in Subject Vehicle 1.

81.　　NILES told VANDIVER and CS-1 that he would help them out this one time, but that they would need to purchase heroin directly from the heroin source in the future. A short time later, JERRY MCALLISTER (also known as "Face") arrived in a vehicle. This vehicle is registered in MCALLISTER's wife's name. Law enforcement obtained a photograph of JERRY MCALLISTER and later showed CS-1. CS-1 confirmed MCALLISTER was the heroin source of supply at the deal. CS-1, VANDIVER, NILES, and MCALLISTER all exited their vehicles and entered the hotel.

82.　　After introductions were made, CS-1 exchanged phone numbers with MCALLISTER. CS-1 then provided MCALLISTER with $6,900 and purchased approximately 79 grams of heroin.

83.　　When CS-1 and VANDIVER returned to VANDIVER's vehicle, VANDIVER informed CS-1 that NILES would want to know the quality of the heroin, because he is giving MCCALLISTER "bricks" (kilograms) of cocaine. VANDIVER further stated that NILES liked to see them succeed. VANDIVER reported NILES will look out for them and if

MCCALLISTER provided them poor quality heroin then VANDIVER and CS-1 could go above MCCALLISTER.

84. The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 75.17 grams of a mixture containing heroin and fentanyl.

J. Controlled Purchase of Heroin from MCCALLISTER on May 2, 2017

85. On May 2, 2017, CS-1, at law enforcement direction, contacted MCCALLISTER and ordered three (3) ounces of heroin. MCALLISTER instructed CS-1 to meet him on South Pickett Street in Alexandria, Virginia, which is located within the Eastern District of Virginia. Law enforcement observed MCCALLISTER arrive in a 2004 Honda Pilot bearing Maryland registration XXX6312 ("Subject Vehicle 2"). Subject Vehicle 2 is also registered to MCALLISTER's wife. MCCALLISTER parked and then entered CS-1's vehicle. MCCALLISTER pulled out a bag of suspected heroin and stated it was three (3) ounces and then handed it to CS-1. CS-1 then paid $6,900 in documented funds to MCCALLISTER. The suspected heroin was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 86.40 grams of heroin.

K. Controlled Purchase of Cocaine Base from VANDIVER on May 4, 2017

86. On May 4, 2017, CS-1, at law enforcement direction, contacted VANDIVER and ordered three (3) ounces of cocaine base. VANDIVER asked CS-1 to meet him at a restaurant located at Daniel Stuart Square in Woodbridge. Upon arriving, VANDIVER entered CS-1's vehicle and VANDIVER then called PETERSON. VANDIVER informed PETERSON that he was waiting for the mother of one of his children to come home, so he (VANDIVER) could retrieve something from her residence. VANDIVER then exited CS-1's vehicle and instructed

29

CS-1 to follow him. Law enforcement followed VANDIVER and CS-1 to Lost Canyon Court in Woodbridge, Virginia. Upon arriving, VANDIVER parked his vehicle and then entered CS-1's vehicle.

87. While in CS-1's vehicle, VANDIVER can be heard communicating with CAREW. CAREW was angry with an individual and can be heard stating that he was going to "beat his ass" or "shoot his shit up" if he wanted to take it there. CAREW then displayed a firearm to VANDIVER and offered to sell it to him for $250. VANDIVER asked if it was clean and CAREW responded he had "never done nothing with it." VANDIVER agreed to purchase it.

88. Based on my review of CAREW's criminal history, I have determined that CAREW has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Prince William County Circuit Court of possession of a firearm by a convicted felon, in violation of Code of Virginia § 18.2-308.2. CAREW is therefore prohibited from possessing firearms under federal law.

89. VANDIVER then placed a phone call to an individual ("Individual 5"). VANDIVER stated, "I know you saw me leave that shit there" and asked how long before Individual 5 got back. A short time later, VANDIVER is observed entering Individual 5's residence located at on Lost Canyon Court, Woodbridge, Virginia. Law enforcement observed VANDIVER exit the residence a short time later holding his genitals (drugs attached to his scrotum). According to CS-1, VANDIVER often conceals drugs in his genital area. Also, according to CS-1, VANDIVER retrieved several ounces of cocaine from Individual 5's apartment. VANDIVER and Individual 5 are reported to have children in common.

30

90.    As VANDIVER and CS-1 drove away from Lost Canyon Court towards Co-Conspirator 2's apartment in Bayside Apartments, VANDIVER received a phone call from Co-Conspirator 3. Co-Conspirator 3 told VANDIVER that he did not want to drive into Bayside Apartments. Law enforcement followed VANDIVER and CS-1 to Co-Conspirator 2's apartment on Bayside Avenue. VANDIVER and CS-1 entered the apartment and PETERSON and his (Peterson's) girlfriend were already inside.

91.    VANDIVER then asked PETERSON if he could take something over to his man. VANDIVER explained his man (Co-Conspirator 3) did not want to drive into Bayview Apartments. CS-1 stated that VANDIVER provided PETERSON with one (1) ounce of cocaine to deliver to Co-Conspirator 3. This information is corroborated by toll records, which show that VANDIVER's known phone was in communication with Co-Conspirator 3. In addition, CS-1 was able to record the bag on top of a digital scale prior to PETERSON retrieving the bag. The bag weighed 32.6 grams.

92.    After this, VANDIVER began manufacturing cocaine base while inside the apartment. VANDIVER continued to speak with CS-1 and PETERSON. PETERSON's girlfriend was also in the apartment while VANDIVER was manufacturing cocaine base. PETERSON then left the apartment with his girlfriend. A short time later, they returned to the apartment. When PETERSON returned, CS-1 reported PETERSON purchased approximately four (4) grams of cocaine from VANDIVER for $100 in CS-1 presence. PETERSON and his girlfriend left and were observed driving away in his girlfriend's vehicle shortly thereafter.

93.    After completing the manufacture of cocaine into cocaine base, VANDIVER provided CS-1 with approximately 187 grams of cocaine base. In return, CS-1 paid VANDIVER $5,400 in documented funds. CS-1 then drove VANDIVER back to Lost Canyon Court. The

suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 185.10 grams of cocaine base.

L.    Controlled Purchase of a Firearm and Cocaine from VANDIVER on May 9, 2017

94.    In the days leading up to this date, VANDIVER contacted CS-1 and asked CS-1 if he wanted to purchase the firearm that CAREW and VANDIVER discussed on May 4, 2017. CS-1 agreed to purchase the firearm along with one (1) ounce of cocaine. VANDIVER instructed CS-1 to come to Co-Conspirator 2's apartment on Bayside Avenue, where CS-1 met VANDIVER.

95.    Law enforcement followed CS-1 and VANDIVER as VANDIVER drove away in his vehicle. VANDIVER reported to CS-1 that he had just purchased a "28," a "62," and a quantity of "hard." In my training and experience, these are common gram quantities of cocaine and hard is a slang term for cocaine base. VANDIVER and CS-1 then returned to Co-Conspirator 2's apartment on Bayside Avenue shortly after they left.

96.    Inside the apartment, CS-1 sat on a chair in the living room and VANDIVER asked him if he could feel anything in it. CS-1 shifted his bodyweight and felt something inside the cushion. VANDIVER explained that if law enforcement ever found the drugs hidden inside the pillow, he (VANDIVER) did not live there and would contest his possession. CS-1 also reported that VANDIVER cut out a portion of foam inside one of the cushions and inside there was a "four deuce" or 4.5 ounces of cocaine inside clear plastic bags (126 grams).

97.    VANDIVER informed CS-1 that one ounce of cocaine would cost $1,400. VANDIVER then took out 4.5 ounces of cocaine and placed it on the dining room table. VANDIVER scooped out cocaine and packaged it for CS-1. VANDIVER reported he was

32

trying to make a $300 profit from the firearm CS-1 was going to purchase. CS-1 handed VANDIVER $2,000 in documented funds and received the ounce of cocaine.

98.     VANDIVER and CS-1 then left Co-Conspirator 2's Bayside Avenue apartment and travelled to an apartment on Lost Canyon Court, Woodbridge. Law enforcement observed VANDIVER enter Individual 5's apartment without CS-1 and return a short time later and subsequently open and close the trunk of his vehicle. CS-1 later informed law enforcement that VANDIVER took the remainder of the "four deuce" from the Bayside Avenue apartment and left it inside Individual 5's residence. VANDIVER then reentered his vehicle carrying a white towel, which covered the firearm. VANDIVER reported the firearm was rusty, but he had cleaned it. VANDIVER wiped down the firearm, and then handed it to CS-1 to inspect. VANDIVER took the firearm back, wrapped it back up in the towel, and placed it on the driver's seat between his leg and center console. Law enforcement then followed VANDIVER and CS-1 back to Co-Conspirator 2's Bayside Avenue apartment parking lot. CS-1 then returned to his vehicle and drove to meet law enforcement.

99.     CS-1 provided law enforcement with the firearm and suspected cocaine. The firearm is a Smith & Wesson .40 caliber pistol. Based upon my training and experience, I know the Smith & Wesson pistol to be a firearm as that term is defined under Title 18, United States Code, Section 921 (a)(3). The suspected cocaine was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.98 grams of cocaine hydrochloride.

     M.     Controlled Purchase of a Cocaine Base from PETERSON on May 10, 2017

100.     On May 10, 2017, CS-1, at law enforcement direction, provided PETERSON with the phone numbers of two cooperating sources. CS-1 informed PETERSON that the two cooperating sources were former customers of CS-1, who moved to PETERSON's area.

33

101.    CS-2 has been convicted of felony possession of a schedule I/II substance in the Commonwealth of Virginia. CS-2 began working with ATF in 2002 and works for compensation. CS-3 has been convicted felony possession of cocaine in the Commonwealth of Virginia. CS-3 began working with ATF in 2015 and works for compensation. CS-4 has been convicted of four felony convictions in the Commonwealth of Virginia to include Possession of Cocaine, Forgery, and Distribution of Cocaine. CS-4's last felony conviction was in 1997. CS-4 began working with ATF in 2015 and works for compensation. CS-2 died unexpectedly during the week of November 13, 2017. All of CS-2's controlled purchases were audio and video recorded. Further, law enforcement conducted surveillance of the deals. Further, for all of CS-2's deals another cooperating source was also present.

102.    On May 8, 2017, PETERSON called CS-2 and introduced himself to CS-2. CS-2 ordered one-half (1/2) ounce of cocaine base and agreed to a price of $950. On May 10, 2017, PETERSON instructed CS-2 to meet him near the Hidden Valley trailer park in Stafford, Virginia, within the Eastern District of Virginia. CS-2, CS-3 and CS-4 drove to a 7-Eleven located at 3623 Jefferson Davis Highway, Stafford, Virginia, and CS-2 informed PETERSON they had arrived. A short time later, PETERSON was observed arriving as a passenger in his girlfriend's vehicle. His girlfriend parked and PETERSON then entered CS-2's vehicle (CS-3 and CS-4 were also in the vehicle). PETERSON pulled out a bag of suspected cocaine base and CS-2 in return paid $950 in documented funds to PETERSON. The suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 14.58 grams of cocaine base.

N.    Controlled Purchase of Cocaine Base from PETERSON on May 17, 2017

103.    On May 15, 2017, CS-2, at law enforcement direction, contacted PETERSON and ordered one-half (1/2) ounce of cocaine base. PETERSON told CS-2 it would be the same price as the previous deal. CS-2 reminded PETERSON that he offered to lower the price next time. PETERSON then agreed to sell the cocaine for $850. CS-2 informed PETERSON that CS-3 and CS-4 also wanted to purchase one-half (1/2) ounce of cocaine base. CS-2 and PETERSON agreed to meet at the 7-Eleven located at 3623 Jefferson Davis Highway for the purchase of a combined total of one ounce of cocaine base.

104.    CS-2, CS-3 and CS-4 arrived at the meeting location and contacted PETERSON, who advised that he would arrive shortly. Law enforcement observed a known individual ("Individual 6") pickup PETERSON at his residence. Law enforcement then observed PETERSON place a blue bag in the trunk and another bag in the rear seat.

105.    Law enforcement followed PETERSON and Individual 6 to the meeting location. Upon arriving, PETERSON entered CS-2's vehicle (CS-3 and CS-4 was also present). CS-2 provided PETERSON with $1,700 in documented funds for CS-2's half-ounce (1/2) and CS-3 and CS-4's half-ounce (1/2) of cocaine base. CS-4 asked PETERSON what the price break would be if he purchased an ounce of cocaine base and PETERSON responded that the price would be $1,300. The suspected cocaine base purchased by CS-2, CS-3 and CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 25.75 grams of cocaine base.

O.    Controlled Purchase of Cocaine Base from PETERSON on May 24, 2017

106.    On May 24, 2017, CS-4, at law enforcement direction, contacted PETERSON and ordered one and one half (1.5) ounces of cocaine base. PETERSON initially stated he would sell the cocaine for $1,500; however, CS-4 negotiated the price to $1,300 for the ounce and $750 for

the half ounce. PETERSON agreed to meet at the 7-Eleven located at 3623 Jefferson Davis Highway. Upon arriving, PETERSON entered CS-4's vehicle and provided one and one half ounces (1.5) of cocaine base to CS-4. After CS-4 weighed the cocaine base, it was light and CS-4 renegotiated the price and then provided PETERSON with $2,000. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 41.08 grams of cocaine base.

P. VANDIVER Discusses Drugs being Transported to Fredericksburg on May 18, 2017

107. On May 18, 2017, CS-1 met with VANDIVER to conduct a drug transaction. During the encounter, VANDIVER reported drugs were being transported to Fredericksburg, Virginia. VANDIVER stated his people were dropping off one-half (1/2) a kilogram of cocaine every Friday.

Q. Controlled Purchase of Cocaine Base from PETERSON on June 2, 2017

108. On May 30, 2017, CS-4, at law enforcement direction, contacted PETERSON and ordered one and one half (1.5) ounces of cocaine base. PETERSON responded that he would sell the cocaine base for $2,150. CS-4 and PETERSON agreed to meet on June 2, 2017. PETERSON instructed CS-4 to meet him in Triangle, Virginia.

109. Law enforcement surveillance observed PETERSON's girlfriend pick up PETERSON at his residence in her vehicle. PETERSON instructed CS-4 to meet him at the Dunkin Donuts located in Triangle, Virginia. Prior to the transaction, law enforcement observed PETERSON and his girlfriend arrive at Co-Conspirator 2's Bayside Avenue apartment. Law enforcement then observed both enter the same building used by VANDIVER on previous occasions with CS-1 to manufacture and package cocaine and cocaine base. In addition, law

enforcement observed these individuals coming in and out of the building using a surveillance camera.

110.    At the meeting location, PETERSON exited his girlfriend's vehicle and entered CS-4's vehicle. PETERSON provided CS-4 with a bag containing cocaine base and CS-4 provided PETERSON with $2,000. During the transaction, law enforcement observed Co-Conspirator 3 arrive in the same parking lot. CS-4 commented to PETERSON that Co-Conspirator 3 was looking at him counting the money but PETERSON was not concerned.

111.    Law enforcement then observed PETERSON meet with Co-Conspirator 3 and conduct what appeared to be another drug transaction. PETERSON then walked to his girlfriend's vehicle, while Co-Conspirator 3 went to a third party's vehicle and conducted what appeared to be a drug transaction. Co-Conspirator 3 walked away from the third party's vehicle and back to the driver's side of PETERSON's girlfriend's vehicle. PETERSON's toll records show him in communication with VANDIVER and Co-Conspirator 3 during this encounter.

112.    CS-4 departed with the purchased cocaine base. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 41.97 grams of cocaine base.

R.    IGB Gang Meeting on May 13, 2017

113.    CS-1 was debriefed about a gang meeting that took place in Norfolk, Virginia. CS-1 reported that IGB members discussed an attempted armed home invasion in Woodbridge, Virginia. According to CS-1, VANDIVER directed members to conduct an armed home invasion of a rival gang member that was alleged to have a large sum of U.S. currency. The IGB gang members were armed with a Draco pistol and observed the intended target inside of his

37

residence. Two of the three gang members decided not to participate and the robbery was called off.

114. During the meeting, CS-1 learned from other IGB members that MCCALLISTER opened a carpet cleaning business. MCCALLISTER was reported to be supplied heroin by MARK KETTER (also known as "Tana," also known as "VA Tana") ("KETTER").

S.     Controlled Purchase of Cocaine Base from PETERSON on June 16, 2017

115. On June 13, 2017, a cooperating source ("CS-4") contacted PETERSON and ordered two (2) ounces of cocaine base, one for CS-2 and one for CS-4. PETERSON agreed to sell the cocaine base for $1,350 per ounce.

116. On June 16, 2017, CS-4 contacted PETERSON, who instructed CS-2 and CS-4 to meet him in Dumfries, Virginia. Law enforcement surveillance observed PETERSON's girlfriend pick up PETERSON at his residence in her vehicle.

117. Prior to the transaction, law enforcement observed PETERSON and his girlfriend at a residence located on Point Pleasant Lane, Dumfries, Virginia. At that time, PETERSON's toll records show him in communication with VANDIVER. VANDIVER is also known to frequent the address on Point Pleasant Lane. PETERSON and his girlfriend left the residence and traveled to the meeting location.

118. At the meeting location, PETERSON exited his girlfriend's vehicle and met with CS-2 and CS-4. PETERSON provided the bag containing two (2) ounces of cocaine base to CS-4, who in return provided PETERSON with $2,700 in documented funds. The suspected cocaine base purchased by CS-4 and CS-2 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 55.35 grams of cocaine base.

T.    CS-1 and VANDIVER Discuss IGB Interstate Drug Trafficking Network on June 17, 2017

119.    At law enforcement direction, CS-1 met with VANDIVER and traveled in his vehicle to a restaurant in Woodbridge. VANDIVER and CS-1 met with Unnamed IGB Member 4, who holds the rank of World Wide High (top leadership tier within IGB). VANDIVER proposed that he (VANDIVER), CS-1, and Unnamed IGB Member 4 pool $10,000 per person as seed money to fund a large purchase of cocaine and marijuana. VANDIVER further proposed they organize a "money team" of the top five performers within each city where the IGB have a presence.

U.    Controlled Purchase of Cocaine Base from PETERSON on June 22, 2017

120.    On June 20, 2017, CS-2 contacted PETERSON and ordered two (2) ounces of cocaine base. PETERSON agreed to meet CS-2 on June 22 at the same location in Triangle. CS-2 and CS-3 arrived at the meeting location, CS-2 received a text message from PETERSON stating, "I'm cooking now" (manufacturing cocaine base). When CS-2 asked how long PETERSON would be, PETERSON reported, "At least 30 just got it."

121.    Law enforcement located vehicles associated with PETERSON and VANDIVER outside of Co-Conspirator 2's Bayside Avenue Apartment in Woodbridge. Law enforcement observed VANDIVER and PETERSON exit the apartment building together and then enter VANDIVER's vehicle. Shortly thereafter, VANDIVER's vehicle arrived at the meeting location. PETERSON exited VANDIVER's vehicle and then entered CS-2's vehicle (CS-3 was also in the vehicle). PETERSON provided CS-2 with a bag containing two (2) ounces of cocaine base and in return CS-2 provided him with $2,700 in documented funds. After the transaction, PETERSON reentered VANDIVER's vehicle and departed the area. The suspected cocaine base

purchased by CS-2 and CS-3 had a positive field test and has been submitted to the DEA Mid Atlantic Laboratory for testing.

V. CS-1 and VANDIVER Discuss PETERSON Manufacturing Cocaine Base on June 27, 2017

122. On June 27, 2017, CS-1 recorded a conversation with VANDIVER in which VANDIVER discussed PETERSON manufacturing cocaine base. VANDIVER reported PETERSON had purchased one-half (1/2) ounce of cocaine from him. PETERSON later called VANDIVER and asked for help manufacturing cocaine base. VANDIVER told PETERSON he was unavailable to cook the cocaine base, so PETERSON attempted to do it himself. VANDIVER found it amusing because PETERSON contacted him via FaceTime and he had an excessive amount of water in the cocaine mixture. VANDIVER further reported PETERSON had a crack smoker there helping him cook. VANDIVER said PETERSON had boiled the cocaine and messed up the process badly.

W. PETERSON involved in a shooting in Stafford County, Virginia

123. On July 5, 2017, a shooting was reported to the Stafford County Sheriff's Office ("SCSO"). The initial investigation revealed PETERSON, his girlfriend, and Individual 6 had a dispute with a rival group of individuals that culminated in a shootout. During the exchange of gunfire, Individual 6 was shot in the lower body.

124. Law enforcement had placed a surveillance camera on PETERSON's apartment building prior to this incident. At approximately 1:17 a.m., PETERSON and his girlfriend can be observed running towards PETERSON's apartment building on Garrison Woods Drive, Stafford, Virginia. PETERSON was observed stepping out to the front porch and looking around the corner. At one point in the video, PETERSON is observed raising a firearm and firing two to

three rounds at individuals in the parking lot. Those individuals took cover in between parked cars. PETERSON is then observed picking up items believed to be casings or shells from the ground.

X.     CS-1 met with VANDIVER and Unnamed IGB Member 5 on July 25, 2017

125.     On July 25, 2017, law enforcement followed CS-1, who was acting at law enforcement direction, and observed CS-1 pickup a co-conspirator ("Co-Conspirator 4") and drive to Lost Canyon Court to meet VANDIVER. When they arrived, CS-1 and Co-Conspirator 4 entered VANDIVER's vehicle and drove to 15144 Cloverdale Road, Woodbridge, Virginia 22193. After several hours, the group traveled to an apartment located on Berlin Court in Woodbridge. The group then travelled to an apartment on Lost Canyon Court, Woodbridge, Virginia. CS-1 learned that this location was ANGLIN's new residence. Similar to ANGLIN's Bellona Road apartment, while inside ANGLIN's new apartment, VANDIVER manufactured cocaine base. Upon finishing the manufacture, law enforcement followed VANDIVER to a gas station on Annapolis Way in Woodbridge, where VANDIVER sold the quantity of cocaine base to EDLER. After the transaction, law enforcement followed VANDIVER back to 15144 Cloverdale Road.

Y.     Controlled Purchase of Cocaine Base from PETERSON on July 26, 2017

126.     On July 24, 2017, CS-4 ordered one (1) ounce of cocaine base from PETERSON. PETERSON agreed to meet at the same location in Triangle, Virginia, on July 26.

127.     After confirming CS-4 was on site, law enforcement observed VANDIVER's vehicle pull into the parking lot. PETERSON exited VANDIVER's vehicle and entered CS-4's vehicle. PETERSON provided CS-4 with a bag containing one (1) ounce of cocaine base. CS-4 paid PETERSON with $1,300 in documented funds. After the transaction, PETERSON

reentered VANDIVER's vehicle and departed the area. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.40 grams of cocaine base.

      Z.      Controlled Purchase of Two Firearms from VANDIVER on July 27, 2017

128.     On July 27, 2017, VANDIVER sent CS-1 a photograph of two firearms and reported they were for sale. CS-1 agreed to purchase the firearms and coordinated a purchase of marijuana via VANDIVER. VANDIVER directed CS-1 to 15144 Cloverdale Road, Woodbridge, Virginia. Law enforcement observed VANDIVER at the residence via a law enforcement surveillance camera positioned on the home. CS-1 drove to the residence. Upon entering the residence, CS-1 met and spoke with VANDIVER and Co-Conspirator 4.

129.     Inside a screened in area in the rear of the residence, VANDIVER informed CS-1 that one of the firearms could use a suppressor. VANDIVER also discussed large capacity magazines. Via CS-1's audio recording/transmitting equipment, law enforcement heard firearms being manipulated. CS-1 later reported Co-Conspirator 4 who is also prohibited from possessing firearms due to felony convictions held one of the firearms and manipulated the firearm. VANDIVER reported one of the firearms had a lot of kick and told CS-1 to hold it in his body.

130.     During the transaction, VANDIVER reached into a white container with a twist off lid located next to the couch in the same area, and obtained what appeared to be an "8-ball" (3.5 grams) of cocaine. CS-1 provided VANDIVER with $1,300 in documented funds for the firearms and placed them in a shoebox. Prior to departing, CS-1 placed the shoebox containing the firearms in the trunk of VANDIVER's vehicle for security.

131.     VANDIVER, Co-Conspirator 4, and CS-1 departed the residence in CS-1's vehicle. Law enforcement followed the vehicle to the Tanger Outlets located in National Harbor,

Maryland. VANDIVER discussed his hatred of corrections officers, and how he would place a tracker underneath an officer's vehicle, follow them around for a month, and eventually kill the officer. This was general conversation and no specific threat was made.

132.    Once in the area of the Tanger Outlets, VANDIVER received a call and informed the caller of his location in the parking lot near the Ralph Lauren store. Law enforcement observed CAREW arriving to the parking lot in a Mercedes SUV bearing Ohio registration XXX-7303. CS-1 paid VANDIVER $2,800 per pound of marijuana and ordered three pounds. CAREW charged $2,700 per pound and VANDIVER charged a $100 per pound tax for the introduction to CAREW according to CS-1. CS-1 provided VANDIVER with $8,400 in documented funds. VANDIVER exited CS-1's vehicle and entered CAREW's vehicle. CS-1 and Co-Conspirator 4 drove behind CAREW to the Sunoco gas station in National Harbor. Shortly thereafter, VANDIVER entered CS-1's vehicle and departed the area.

133.    The group returned to 15144 Cloverdale Road, where CS-1 retrieved the purchased firearms from VANDIVER's trunk and departed the residence with the marijuana and firearms. VANDIVER and Co-Conspirator 4 were observed entering the residence carrying a bag.

134.    CS-1 was followed to a meeting location where the marijuana and firearms were collected by law enforcement. The suspected marijuana purchased by CS-1 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 1,266.9 grams of marijuana. The firearms purchased were a Velocity, LLC model VMAC45, .45 caliber pistol and a Glock model 21, .45 caliber pistol. Based upon my training and experience, I know these pistols to be firearms as that term is defined under Title 18, United States Code, Section 921(a)(3).

AA.   Arrest of PETERSON on July 28, 2017

135.   On July 28, 2017, the SCSO obtained an arrest warrant for PETERSON. The charges were related to the July 5, 2017 shooting incident described above in which PETERSON was observed by law enforcement firing a shotgun at a rival group. Warrants for possession of a firearm by a convicted felon, use of a firearm in commission of a felony, reckless handling of a firearm, and discharging a firearm within or at a building occupied by one or more persons were obtained.

136.   On or about July 13, 2017, CS-1 reported to law enforcement that PETERSON had obtained a Glock pistol from VANDIVER's brother, a known gang member. PETERSON had also told CS-1 that he planned to keep the Glock pistol on him at all times. Law enforcement expected PETERSON to be armed, when they observed him exit his residence. When detectives approached PETERSON, he fled on foot into the nearby wood line. A law enforcement K-9 unit tracked PETERSON and he was ultimately arrested in a neighboring residential area.

137.   In addition to the arrest warrants, the SCSO also obtained a search warrant for PETERSON's residence. During the court-authorized search, law enforcement seized an extended magazine with .40 caliber ammunition, a plastic bag containing a substance consistent with cocaine, and a long gun case.

138.   In a monitored telephone call at the Rappahannock Regional Jail, PETERSON contacted VANDIVER and informed him that law enforcement had not found a firearm.

139.   On August 1, 2017, an ATF explosives detection K-9 was summoned to the area to conduct a search in the wooded area where PETERSON had fled. The ATF K-9 and her handler located a Glock model 22, .40 caliber pistol with a laser sight attached in the woods.

The firearm was unloaded and without a magazine. The magazine and ammunition found in PETERSON's residence could be used with this firearm. Based upon my training and experience, I know the Glock pistol to be firearm as that term is defined under Title 18, United States Code, Section 921 (a)(3).

BB. CS-1 Purchases an AK-47 Rifle from TYUS TERRELL on August 1, 2017

140. On July 29, 2017, VANDIVER sent a photograph of an unidentified AK-47 rifle with a high-capacity drum magazine to CS-1. CS-1 agreed to purchase the firearm on August 1, 2017. On that date, VANDIVER instructed CS-1 to meet him at Potomac Mills Mall. Law enforcement located VANDIVER with a known individual ("Individual 7"). CS-1 met up with them and VANDIVER instructed him to follow in his vehicle.

141. While driving, VANDIVER contacted CS-1 via FaceTime and told him they would be going to a location off Birchdale Avenue. While Individual 7 remained in the parking lot, VANDIVER led CS-1 to a residence on Belvedere Drive in Woodbridge where he (VANDIVER) and CS-1 entered the residence. Inside the residence, CS-1 reported the AK-47 was leaning against a piece of furniture in the kitchen. VANDIVER introduced CS-1 to "TAZ" (known to law enforcement as TYUS TERRELL ("TERRELL")). CS-1 informed law enforcement that TERRELL is a "minion" or subordinate of JOHNSON. JOHNSON is a Milla Time Blood and the reported regional leader of the gang. TERRELL is a Family over Everything (FOE) gang member as well.

142. CS-1 provided $300 in documented funds to VANDIVER inside the kitchen as a tax for setting up the transaction. CS-1 then placed the $1,300 in documented funds on the kitchen table to purchase the AK-47. TERRELL collected the money and then provided CS-1 with the high-capacity drum magazine for the rifle. The rifle is an Inter Ordnance Incorporated

45

AK-47-C, 7.62x39 caliber rifle. An NCIC query of the firearm also revealed the firearm was reported stolen from Stafford County, Virginia.

143. Based upon my training and experience, I know the Inter Ordnance Incorporated rifle to be a firearm as that term is defined under Title 18, United States Code, Section 921 (a)(3). Further, this firearm is not manufactured in the Commonwealth of Virginia; consequently, any Inter Ordnance Incorporated rifle found in the Commonwealth of Virginia have traveled in interstate and/or foreign commerce from their point of manufacture outside of the Commonwealth of Virginia into the Commonwealth of Virginia.

144. After the identification of TERRELL's alias as "Taz," law enforcement recalled the purchase of a firearm on March 23, 2017 from a "Taz," who was unidentified at the time. Upon reviewing information from that date, law enforcement determined the firearm was purchased from TERRELL then as well. On that date, TERRELL sold a Hi-Point model C9 9mm pistol in Woodbridge, Virginia to a cooperation source ("CS-5"). CS-5 provided law enforcement with TAZ's social media account at the time, which law enforcement used to positively identify TERRELL in August, 2017.

CC.    Arrest of TERRELL on August 3, 2017

145. After the above transaction, law enforcement learned TERRELL was wanted in Spotsylvania County, Virginia. Law enforcement established surveillance on a location located on Belvedere Drive, and later followed TERRELL after he left the residence. The PWCPD stopped TERRELL's vehicle. TERRELL was arrested from the front passenger seat of the vehicle.

146. Law enforcement seized a Glock model 26, 9mm pistol with an extended magazine from the map pocket of TERRELL's door. Law enforcement also seized suspected

cocaine from the driver's possession. Based upon this search, the PWCPD obtained a search warrant for the residence on Belvedere Drive.

147.    During the court-authorized search of TERRELL's residence, law enforcement seized documented cashier funds used by CS-1 to purchase the AK-47 on August 1, 2017, among other evidence.

148.    Law enforcement later obtained a search warrant for TERRELL's social media accounts. In the social media returns, law enforcement determined that TERRELL's account includes photographs of not only the AK-47, but of firearms purchased by law enforcement from VANDIVER on July 27, 2017. Based on these photographs, I submit that there is probable cause to support that TERRELL was the source of the firearms for the deal on July 27, 2017, as well.

149.    Based on a review of TERRELL's criminal history, I have determined that TERRELL has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Spotsylvania County Circuit Court of possession with intent to distribute marijuana, in violation of Code of Virginia § 18.2-248.1 and Obstruction of Justice, in violation of Code of Virginia § 18.2-460. TERRELL is therefore prohibited from possessing firearms under federal law.

DD.    Rank Structure of the Regional IGB Changes

150.    On August 3, 2017, CS-1 received a text message from Co-Conspirator 4 with the new "line-up" (rank structure) for the IGB in Northern Virginia. Co-Conspirator 4 reported VANDIVER was the HIGH 020. Co-Conspirator 4 is now a Five Star General, CS-1 is a Four Star General, and another co-conspirator is now a Three Star General.

EE.   VANDIVER buys Marijuana from CAREW for LEDERER on August 8, 2017

151.   On August 8, 2017, CS-1, at law enforcement direction, met with VANDIVER at Potomac Mills Mall. CS-1 entered VANDIVER's vehicle and they then both drove to 15144 Cloverdale Road. VANDIVER and CS-1 later traveled to an area restaurant and met Co-Conspirator 4. VANDIVER, CS-1, and Co-Conspirator 4 then drove to 1928 Coppersmith Terrace, Woodbridge, Virginia to meet CAREW. VANDIVER exited the vehicle and went to meet CAREW. VANDIVER returned with a plastic bag that contained approximately one-quarter (1/4) pound of marijuana.

152.   VANDIVER, CS-1, and Co-Conspirator 4 then drove to an apartment complex near Birchdale Avenue and VANDIVER exited the vehicle. CS-1 reported VANDIVER left with the bag of marijuana, met with LEDERER, and returned to the vehicle with money.

153.   VANDIVER, CS-1, and Co-Conspirator 4 then drove back to 1928 Coppersmith Terrace and VANDIVER reported CAREW had just received 100 pounds of marijuana. VANDIVER further reported he wanted to switch out an old pound of marijuana with a fresh pound. Once at the residence, VANDIVER retrieved a bag of marijuana from his trunk and walked over to NATHANIEL BRUCE-COBBOLD ("BRUCE-COBBOLD") (also known as Cedis) a known co-conspirator of CAREW. BRUCE-COBBOLD was sitting inside an Audi vehicle registered in his name. VANDIVER handed BRUCE-COBBOLD the old pound of marijuana and in return BRUCE-COBBOLD handed him the new pound. VANDIVER then placed the new pound of marijuana into his trunk.

FF.   Controlled Purchase of Cocaine Base from EDLER on August 11, 2017

154.   On August 10, 2017, CS-1 and VANDIVER discussed CS-4. CS-4 was purchasing from PETERSON prior to his arrest. VANDIVER asked CS-1 if CS-4 had EDLER's

48

telephone number. CS-1 reported that he did and asked VANDIVER if he wanted CS-1 to "coach" EDLER on how to sell the cocaine base. VANDIVER reported he had already coached him. VANDIVER told CS-1 to inform CS-4 that he would sell them two (2) ounces of cocaine base. VANDIVER further stated that he had five (5) ounces of cocaine on him and he could manufacture ten (10) ounces of cocaine base. He would charge CS-4 $1,800 per ounce and they could have as much as they wanted. VANDIVER reported he did not want to sell to CS-4 directly and he would get someone to sell it to them.

155. On the same date, VANDIVER, CS-1, and EDLER held a three-way recorded phone call in which VANDIVER instructed EDLER to sell two (2) ounces of cocaine base to CS-4. VANDIVER asked EDLER if he was "equipped" to do the transaction, to which EDLER replied he was. VANDIVER stated he would pay EDLER $200 for selling the cocaine base.

156. A three-way recorded phone call between CS-1, CS-4, and EDLER then took place and EDLER instructed CS-4 to meet him in Fredericksburg, Virginia.

157. On August 11, 2017, EDLER contacted CS-4 via text message and stated, "Meet somewhere on 3," referencing Route 3 in Fredericksburg. CS-4 and EDLER agreed to meet in the parking lot of a restaurant on Plank Road, Fredericksburg. EDLER arrived in a gold Honda Civic. CS-4 entered EDLER's vehicle and provided EDLER with $3,600 in documented funds for two (2) ounces of cocaine base. EDLER in return provided the cocaine base. CS-4 asked if the price would be different in the future and EDLER reported it would be less. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 54.13 grams of cocaine base.

GG.  Controlled Purchase of Cocaine Base from EDLER on August 17, 2017

158.  On August 17, 2017, CS-1 advised law enforcement that EDLER contacted him and stated he was unable to get ahold of VANDIVER and that he was concerned because he had arranged to sell three (3) ounces of cocaine base to CS-4. CS-1 contacted VANDIVER after this conversation via FaceTime and VANDIVER reported he had talked to EDLER and told him, "Bro, if you don't want to do it, just let me know." VANDIVER then said he did not hear back from EDLER. VANDIVER stated he would call EDLER and if everything was good, VANDIVER would "whip it" (manufacture cocaine base) and drive there to meet him. CS-1 reported he would go meet VANDIVER shortly and ride with him.

159.  CS-1 met up with VANDIVER and they drove to a residence of a female acquaintance of VANDIVER located on Wakewater Way, Woodbridge, Virginia. CS-1 was able to obtain a phone number for the female acquaintance and VANDIVER's toll records show him communicating with the number on the same date. While inside the residence, VANDIVER was captured by CS-1 holding a black pistol with a flashlight, and a suppressor attached along with a black cable. VANDIVER was reported to be on a FaceTime call at the time, CS-1 believed he was talking to NILES. VANDIVER informed CS-1 that he had purchased the firearm a month prior from EDLER for $350. VANDIVER further reported he had obtained the suppressor from Amazon and that it was not a real suppressor. Moreover, during this investigation law enforcement obtained a search warrant for one of VANDIVER's social media accounts. This same firearm appears in a photo on VANDIVER's social media account on August 17, 2017. In addition, CS-1 captured what appears to be a quantity of cocaine base sitting on a digital scale in front of VANDIVER, while VANDIVER is seen holding the firearm.

160. At law enforcement direction, CS-4 contacted EDLER and ordered three (3) ounces of cocaine base.

161. VANDIVER and CS-1 remained at the Wakewater residence for a time before departing to deliver cocaine base to EDLER. VANDIVER and CS-1 drove to a barbershop located on Lafayette Boulevard, Fredericksburg, Virginia. Law enforcement observed EDLER approach CS-1's vehicle and meet with VANDIVER. CS-1 stated that VANDIVER provided the cocaine base to EDLER and that they planned to meet up after the sale to CS-4, so EDLER could pay VANDIVER for the cocaine base.

162. EDLER instructed CS-4 to meet at a restaurant on Plank Road. At the meeting location, CS-4 entered EDLER's vehicle and provided EDLER with $4,500 in documented funds. EDLER then handed CS-4 two (2) ounces of cocaine base. CS-4 reported he was short (supposed to be three ounces) and EDLER reported there was confusion and he only brought two (2) ounces of cocaine base. EDLER returned $1,500 in documented funds to CS-4.

163. Law enforcement followed EDLER after the drug transaction to the Spotsylvania Mall. EDLER was observed meeting with VANDIVER and, according to CS-1, EDLER paid VANDIVER. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 52.81 grams of cocaine base.

HH. Controlled Purchase of Cocaine Base from VANDIVER on August 31, 2017

164. On August 31, 2017, CS-1, at law enforcement direction, ordered a $15,000 quantity of cocaine base from VANDIVER. CS-1 placed a recorded FaceTime call to VANDIVER, who instructed him to meet at an apartment on Vantage Drive, Woodbridge, Virginia. Once there, VANDIVER and a known individual ("Individual 8") entered CS-1's vehicle. Law enforcement followed the group to the parking lot of ANGLIN's apartment at Lost

51

Canyon Court. VANDIVER exited CS-1's vehicle and, according to CS-1, VANDIVER called

ANGLIN. This was corroborated by VANDIVER's phone records. CS-1 also heard

VANDIVER call someone else and state, "I need 10." VANDIVER's toll records reveal he

contacted ANGLIN and NILES during this timeframe.

165.    Law enforcement observed VANDIVER enter and later exit ANGLIN's residence

on Lost Canyon Court. VANDIVER, CS-1, and Individual 8 were then followed to the area of

Berlin Court, Woodbridge, Virginia. VANDIVER received a phone call and stepped out of the

vehicle. CS-1 reported VANDIVER entered an apartment located on Berlin Court. When

VANDIVER returned, he told CS-1 that he just sold one (1) ounce of cocaine to people inside,

who then added 15 grams of Inositol (a cutting agent), wrapped it in aluminum foil, and baked it

in the oven on low. VANDIVER further reported "JACK" (JOHNSON) was inside. Shortly

thereafter, VANDIVER, CS-1, and Individual 8 departed the area.

166.    Law enforcement observed JOHNSON (also known as "JACK") depart the same

area in a Kia sedan. Law enforcement had observed JOHNSON drive this vehicle on other

occasions. CS-1 later informed law enforcement that the Milla Time Bloods are using the

apartment to manufacture and distribute cocaine base and heroin. Further, JOHNSON is the

head of the Milla Time Bloods.

167.    Law enforcement surveillance was also established on NILES on this date.

NILES was observed in a silver Range Rover at 13715 Lynn Street, Woodbridge, Virginia. Law

enforcement later learned that NILES uses apartment #16 on 13715 Lynn Street.

168.    Meanwhile, at approximately 3:45 p.m., VANDIVER was on the phone

discussing what restaurant in the area of Potomac Mills mall they would like to meet at.

According to toll records, VANDIVER and NILES were in contact. After the phone call,

VANDIVER instructed CS-1 to drive behind the Olive Garden restaurant. At approximately 3:49 p.m., NILES departed the Lynn Street apartments followed by law enforcement. NILES was followed to Potomac Mills Mall where he met up with VANDIVER. A short time later, VANDIVER exited CS-1's vehicle and entered NILES' vehicle. VANDIVER returned to CS-1's vehicle with approximately ten (10) ounces of cocaine.

169.    After the transaction, NILES was followed to 15144 Cloverdale Road, where he entered the residence. NILES then departed the residence and entered a black Ford pickup truck and departed again. Law enforcement then followed NILES to 10532 Cooktown Road, Spotsylvania, Virginia. NILES and the other occupant of the vehicle drove past the residence and into a wood line behind the residence. It appeared to law enforcement that NILES and the other individual were burying something in the wooded area. Law enforcement would also later learn that NILES frequents this residence. However, law enforcement have not surveilled NILES entering the residence; rather, NILES has only been observed entering the wooded area.

170.    Meanwhile, law enforcement continued to follow VANDIVER, CS-1, and Individual 8 as well. The group traveled to a store and CS-1 reported VANDIVER purchased items needed to manufacture cocaine base. The group then traveled to an apartment on Vantage Drive and entered the apartment. Inside the apartment, VANDIVER manufactured the ten (10) ounces of cocaine purchased from NILES into approximately thirteen (13) ounces of cocaine base. CS-1 reported Individual 8 was present during the cooking process, but did not participate.

171.    After preparing the cocaine base, CS-1 and VANDIVER departed the apartment with the cocaine base. They reentered VANDIVER's vehicle and travelled to 15144 Cloverdale Road. VANDIVER traveled to this residence to find a scale that could measure the weight of the cocaine base. VANDIVER took CS-1 to the screened in porch area on the rear of the residence.

53

VANDIVER then placed the cocaine base onto a scale. Upon reviewing the video recording, the number "381" or "387" was displayed on the LCD screen, which indicates the weight in grams. VANDIVER and CS-1 then returned to the apartment on Vantage Drive. The suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 369.89 grams of cocaine base.

## II. VANDIVER Displays New Firearms and Discusses Drug Trafficking with CS-1

172.    On or about September 5, 2017, CS-1 reported VANDIVER had sent him a picture of an AR pistol type firearm with a red paint scheme and images of what appeared to be zombies. The firearm appeared to be loaded and a "SIGHTMARK" red dot or holographic sight was attached to the top rail of the firearm.

173.    On or about September 8, 2017, CS-1 reported VANDIVER was at ANGLIN's residence located on Lost Canyon Court measuring out a "four-deuce" (4.5 ounces) of cocaine on the kitchen counter. CS-1 was able to photograph VANDIVER measuring out the cocaine. CS-1 also took a photograph of a firearm in a box displaying "Smith &Wesson M&P" on it.

## JJ. CS-1 Provides Intelligence on IGB and NILES and VANDIVER Sell Cocaine while Armed on September 23, 2017

174.    On September 23, 2017, CS-1 was visiting VANDIVER at his new apartment located at 1288 Bayside Avenue #11, Woodbridge, Virginia. While there, CS-1 recorded Unnamed IGB Member 4 purchasing one ounce of cocaine from VANDIVER. VANDIVER was also recorded passing around an AR style pistol that he had in his possession in the apartment. This is believed to be the same pistol previously observed near a manufacturer's box labeled as a Smith and Wesson M&P15-22P. 22 caliber pistol.

54

175.	VANDIVER discussed the profits that could be made trafficking firearms to New York and mentioned that he previously sold firearms. He also mentioned purchasing firearms with high-capacity magazines and suppressors. VANDIVER reported he got away with it, but that quite a few people were recently arrested as part of a federal investigation into firearms trafficking from Virginia to New York (Individual 4).

176.	VANDIVER stated that while he was incarcerated in Rappahannock Regional Jail, he had a Puerto Rican cellmate that could buy "birds" (kilogram of cocaine) for $10,000 to $12,000, which they could then sell in this area for $33,000 to $35,000.

177.	CS-1 reported there would be a potential restructuring within the UBN involving IGB. The proposal involved the restructuring of the UBN into a northern and southern group. If this took place, the current IGB leader would be in charge of all Blood gangs from Florida to Philadelphia.

178.	CS-1 reported VANDIVER is purchasing a "four deuce" (4.5 ounces of cocaine) every day or every second day from NILES. Further, NILES now requires VANDIVER to purchase no less than 4.5 ounces at a time. CS-1 reported that VANDIVER on some days sells more than one "four deuce" in a day.

179.	During the above encounter with VANDIVER, CS-1 reported he traveled with VANDIVER to deliver cocaine to EDLER.

KK.	<u>VANDIVER sells Marijuana to Unnamed IGB Member 4 on September 26, 2017</u>

180.	CS-1 reported that while he was at 1288 Bayside Avenue #11, he observed VANDIVER sell one pound of marijuana to Unnamed IGB Member 4. While in the apartment, CS-1 observed four firearms to include a pistol with a fake suppressor, a red Smith & Wesson M&P 15 .22 caliber pistol, a .357 revolver, and a derringer style pistol. CS-1 captured a

photograph of the marijuana being sold to Unnamed IGB Member 4 prior to the transaction. CS-1 reported VANDIVER continues to sell drugs from the apartment with his roommate.

LL.    CS-1 Provides Intelligence on VANDIVER and NILES

181.    On September 29, 2017, at law enforcement direction, CS-1 socialized with VANDIVER. VANDIVER brought up Unnamed IGB Member 3 selling cocaine to CS-4. VANDIVER believed CS-1 was still selling cocaine base to CS-4 and that if anyone should get their business it should be Unnamed IGB Member 3 because he has the most experience selling cocaine.

182.    VANDIVER received a phone call and placed it on speakerphone so CS-1 could hear the call. VANDIVER told the caller that he attempted to purchase two (2) zips (ounces) of cocaine from "RAY" (NILES), but NILES made him purchase four and a half. VANDIVER later explained to CS-1 that NILES had increased his cocaine distribution and would no longer sell cocaine in amounts less than 4.5 ounces. Later that day, CS-1 observed VANDIVER sell 1/8 ounce of cocaine to Co-Conspirator 4.

183.    On September 30, 2017, CS-1 observed VANDIVER sell 1/8 ounce of cocaine to EDLER.

184.    On October 1, 2017, CS-1 observed VANDIVER package an ounce of cocaine while at 1288 Bayside Avenue #11 and then sell it to an individual previously observed by CS-1 at an apartment on Berlin Court.

185.    CS-1 then travelled with VANDIVER to a co-conspirator's ("Co-Conspirator 5") house, which is located on Point Pleasant Lane, Dumfries, Virginia, where VANDIVER sold another ounce of cocaine to Co-Conspirator 5.

186.    Law enforcement learned that NILES left the area on a one-way flight to Atlanta, Georgia. Upon learning this information, CS-1 was directed to order a large quantity of cocaine from VANDIVER in an attempt to have NILES direct a partner to deliver the cocaine to VANDIVER and CS-1.

187.    On October 30, 2017, CS-1 was provided with $20,000 in documented funds to purchase a quantity of cocaine. Law enforcement observed VANDIVER arrive at 1288 Bayside Avenue #11. At law enforcement direction, CS-1 met VANDIVER there.

188.    When CS-1 entered the apartment, CS-1 reported VANDIVER was on the phone with CAREW and that another male was present. VANDIVER could be heard saying, "someone brought back a bag with twenty bands in it, God is good" ($20,000). CS-1 proposed the purchase of "half a bird" (half a kilogram of cocaine) to VANDIVER. VANDIVER called someone, asked for a number, and stated he would call him on his (VANDIVER's) new phone. Call records reveal VANDIVER contacted his mother during this timeframe. CS-1 informed law enforcement that he overheard a conversation between VANDIVER and the other male present, in which VANDIVER informed the male that he was out of cocaine.

189.    VANDIVER confirmed the order with CS-1 and then placed a call. CS-1 reported VANDIVER was calling who he believed to be NILES. VANDIVER could be heard asking the subject believed to be NILES, "You still out of town?" Law enforcement knew that NILES had traveled to Atlanta prior to this date. The subject could be heard replying, "Yea." VANDIVER then asked, "Can I get with somebody or what?" VANDIVER stated, "Nigga, I

need half a joint." VANDIVER then asked the male on the other end of the call, "If I want half a joint can I get half a joint?" The subject replied, "Yea."

190.    CS-1 agreed to a price of $20,000 for half a kilogram of cocaine (500 grams). CS-1 was advised it would be approximately 1.5 hours until the cocaine was delivered. VANDIVER informed CS-1 (law enforcement monitored) that NILES traveled to Atlanta, Georgia to celebrate being off probation. This corroborated the above information that it was NILES that VANDIVER contacted.

191.    VANDIVER also reported that he (VANDIVER) had changed his phone number because he had received numerous jail calls from inmates. VANDIVER also discussed a prior robbery in the Summerland Apartment Complex in Woodbridge in which the victim threw a baby at VANDIVER and that the baby hit the wall. VANDIVER stated he became very upset and attempted to calm the baby down.

192.    At approximately 5:41 p.m., CS-1 informed law enforcement that the cocaine was currently in the parking lot and VANDIVER was in the process of counting money. VANDIVER was observed walking out of 1288 Bayside Avenue #11 carrying a light colored bag walking towards the dumpster area of the parking lot. A short time later, law enforcement observed VANDIVER return to 1288 Bayside Avenue #11 carrying a different bag. A silver Audi was observed departing the same area. Law enforcement observed this same Audi meet with NILES on August 31, 2017, just prior to NILES selling ten (10) ounces of cocaine to VANDIVER, who then manufactured cocaine base for CS-1.

193.    VANDIVER returned to the apartment, where he put on rubber gloves, opened the package, and then weighed the suspected cocaine on a digital scale. The suspected cocaine

was observed in a plastic food saver bag. VANDIVER and CS-1 reported the cocaine weighed approximately 502 grams.

194.    Law enforcement followed the Audi after it departed the area to the area of 2750 Green Ash Loop, Woodbridge, Virginia. During the course of this investigation, surveillance established that NILES uses this residence. The sole occupant of the Audi carried the light colored plastic bag into the building. A short time later, the same subject exited 2750 Green Ash Loop without the bag and departed in the Audi. The vehicle was then followed to the Smokey Bones parking lot in Woodbridge. The driver of an unidentified black Dodge Challenger entered the front passenger seat of the Audi. The parties separated again and the Audi was followed to a residence on Candlewood Court, Woodbridge, Virginia. The occupant of the Audi entered the residence, then exited and departed again in the vehicle. The vehicle was lost by surveillance for approximately 20 minutes.

195.    Law enforcement re-acquired surveillance of the Audi and coordinated a traffic stop by PWCPD. There were now two occupants in the Audi; however, law enforcement identified the driver as the same individual observed operating the vehicle throughout this operation. PWCPD identified the driver as CHENNOR MARLEY BAH ("BAH"). CS-1 was later displayed a photograph of BAH and CS-1 positively identified him as an individual he saw deliver cocaine to VANDIVER on prior occasions.

196.    The suspected cocaine hydrochloride purchased field tested positive and was submitted to the DEA Mid-Atlantic Laboratory to be analyzed.

197.    After identifying BAH, a criminal history check revealed he was arrested in 2012 by the DEA for dangerous drugs in Washington, D.C. BAH was also found guilty of two felony counts of Possession with Intent to Distribute Schedule I/II Drugs in the Commonwealth of

59

Virginia on January 10, 2014 and appears to be currently on supervised probation. A law enforcement database check also revealed BAH had been arrested in the past with another co-conspirator, Nathaniel BRUCE COBBOLD.

198. A Virginia Employment Commission query revealed BAH has not had reported income since the fourth quarter of 2015.

199. The Audi driven by BAH had been previously observed by law enforcement following NILES. On August 31, 2017, VANDIVER ordered 10 ounces of cocaine from NILES to manufacture into cocaine base for CS-1. Prior to NILES selling 10 ounces of cocaine to VANDIVER in Woodbridge, Virginia, he was observed by law enforcement in Alexandria, Virginia. There, NILES was observed pulling into a parking lot and meeting with an individual operating the same Audi BAH was operating. NILES met with the occupant of the Audi, then drove directly to a suspected stash house on Lynn Street in Woodbridge. From Lynn Street, NILES was followed to the transaction with VANDIVER and CS-1.

200. On October 17, 2017, law enforcement observed NILES meet with a subject believed to be BAH in the same Audi in a Walmart parking lot in Woodbridge. NILES entered the front passenger seat of the vehicle.

201. On November 16, 2017, law enforcement observed BAH in the same Audi arrive and depart from his residence at 12291 Granada Way inWoodbridge. BAH was again the driver of the vehicle and was followed from the residence to a gas station parking lot on Old Bridge Rd. BAH parked beside a female in a silver Ford Taurus, who was then observed entering BAH's vehicle. Approximately two minutes later, the female exited BAH's vehicle, reentered the Taurus, and both vehicles departed the area. Based on the training and experience of the law

enforcement officers present, the law enforcement officers believe that BAH provided the female with drugs. .

NN.  Social Media Role in Investigation

202.  During the course of this investigation, law enforcement reviewed publicly available social media and also used undercover social media accounts. This included, but was not limited to Facebook, Instagram, and iCloud. When available, law enforcement recorded social media posts that would not be stored by the providers. Search warrants were obtained for the accounts below. Below, I highlighted only a few relevant posts from one of VANDIVER's social media accounts.

203.  On April 29, 2016, a video of VANDIVER and CAREW rapping in an automobile together is shared.

204.  On September 1, 2016, VANDIVER shared a video of himself holding a TEC-9 style pistol.

205.  On May 24, 2017, VANDIVER shared a photograph of a quantity of marijuana with the caption, "Strain: Kush."

206.  On July 29, 2017, TERRELL sent a photograph of an Inter Ordnance Incorporated AK47 rifle with a high-capacity drum magazine attached and several rounds of 7.62x39 ammunition next to it to VANDIVER. On August 1, 2017, CS-1 would purchase this same firearm, determined to be stolen from Stafford County, Virginia, from TERRELL, through VANDIVER.

207.  On August 13, 2017, VANDIVER shared a video stating, "The police tried to get me right? They said your boy got a warrant right? Fuck them niggas blood, we still got bands on

deck." VANDIVER then took out bundles of money held together by rubber bands and laid them on the ground.

208.    On August 17, 2017, social media user "thenewbarber5" commented on a video shared by VANDIVER. The video was of VANDIVER holding a black pistol with a flashlight and suppressor attached. This appears to be the same pistol captured by CS-1 on the same date. [See Paragraph 155]. VANDIVER and the user of "thenewbarber5" also had a chat conversation on this date. VANDIVER told the user that it would cost him $1,250 for a "zone of ready" (ounce of crack) and that it was the last he had. VANDIVER then informed the user that next week he would have 64 grams of cocaine base form him for $1,700.

209.    On August 18, 2017, VANDIVER shared a video of himself standing on a chair in what appears to be the Wakewater Way address throwing money to the floor stating, "That nigga need a job? Tell that nigga come work for God damn Bando."

210.    On August 24, 2017, VANDIVER shared a video of himself smoking marijuana while walking around a black Dodge Challenger.

211.    On September 28, 2017, VANDIVER shared a photograph of himself holding five bundled stacks of US currency and using the stacks as a pillow.

### Conclusion

212.    Based upon the foregoing, I believe probable cause exists that on or about August 1, 2017, in Prince William County, Virginia, within the Eastern District of Virginia, TYUS TERRELL, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate and foreign commerce, a firearm, that is, an Inter Ordnance Incorporated AK-47-C, 7.62x39 caliber rifle, said firearm having been

distribute and possess with the intent to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I therefore request a warrant be issued for VANDIVER and PETERSON's arrest.

Respectfully submitted,

Michael A. Fernald
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

SUBSCRIBED and SWORN to before me on _____ 12/1 _____, 2017.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

| | |
|---|---|
| **From:** | Lee, Heather (USAVAE) |
| **Sent:** | Monday, December 4, 2017 7:27 AM |
| **To:** | Boddy, Anita B. (USAVAE); Curley, Jamie (USAVAE); Leblanch, Maria L.; McNeill, Loraine (USAVAE); Robinson, Suzanne (USAVAE); Brundage, Fay (USAVAE) |
| **Cc:** | Delawala, Inayat (USAVAE) |
| **Subject:** | Downward Departures |
| **Importance:** | High |

Good morning,

Do not forget, if there are Rule 35s or 5K1.1s, you need to send the following information to me:

Date of Reduction
Defendant's Name
Judge
Attorney
Original Sentence
Percentage of Sentence Received
Final Sentence

Thank you.

Heather J. Lee, ACP
Paralegal Specialist
United States Attorney's Office
Alexandria, VA
703-299-3764